WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stephanie Ann Stanhope, | No. CV-18-4884-PHX-DMF |
| Plaintiff, | |
| v. | **ORDER** |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff Stephanie Ann Stanhope ("Claimant") appeals the Commissioner of Social Security Administration's decision to adopt the Administrative Law Judge's (ALJ's) ruling denying her applications for Disability Insurance Benefits under Title II of the Social Security Act and for Supplement Security Income under Title XVI of the Social Security Act. (Doc. 1, Doc. 15-3 at 20)[1] Claimant argues that ALJ Ted W. Armbruster erred by: (1) assigning little weight to the opinions of John Porter, M.D., within a Physical Residual Functional Capacity Questionnaire dated May 2018; and (2) improperly rejecting Claimant's testimony regarding her pain, symptoms, and level of limitation. (Doc. 18 at 4-16)

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and with the parties' consent to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the Court will affirm the Commissioner's decision.

---

[1] Citation to the record indicates documents as displayed in the official Court electronic document filing system maintained by the District of Arizona under Case No. CV-18-04884-PHX-DMF.

# I.    BACKGROUND

## A.    Application and Social Security Administration review

Claimant was 51 when she filed her applications for disability insurance benefits and supplemental security income on April 10, 2015, alleging a disability onset date of March 3, 2014. (Doc. 15-6 at 2-3, 9; Doc. 15-3 at 17)  The state agency initially determined Claimant was not disabled in September 2015 (Doc. 15-4 at 2-12, 13-21), and again on reconsideration in March 2016 (*Id.* at 24-34, 35-45).  After conducting a hearing on Claimant's applications on May 3, 2018 (Doc. 15-3 at 83-143), the ALJ filed a notice of an unfavorable decision on July19, 2018.  (*Id.* at 14-29)  Claimant then filed an appeal with the Appeals Council, which was denied by notice dated October 22, 2018.  (*Id.* at 2-5)  At that point, the Commissioner's decision became final.  *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1162 (9th Cir. 2012).

## B.    Relevant medical treatment and imaging

### 1.    Maricopa Integrated Health Systems

Claimant reported thoracic spine pain on May 31, 2014.  (Doc. 15-8 at 5-14)  X-rays indicated an unremarkable thoracic spine.  (*Id.*)  Her blood oxygenation ("SpO2") was measured at 99%.[2]  (*Id.* at 7)  On July 3, 2014, Claimant was seen for shortness of breath.  (*Id.* at 17-25)  Her physical examination documented normal range of motion, a normal psychiatric assessment, and SpO2 reading of 96%.  (*Id.* at 20)  In November 2014, Claimant complained of musculoskeletal pain and it was noted she took Tylenol and Ultram for it.  (*Id.* at 27)  Although she displayed diffuse mild wheezes and scattered rhonchi, her SpO2 was measured at 98%.  (*Id.* at 28)

In February 2017, Claimant complained of chest congestion and cough with shortness of breath.  (Doc. 15-11 at 7)  Her SpO2 reading was 95%.  (*Id.* at 7)  Claimant exhibited normal range of motion and normal mood and affect.  (*Id.* at 8)  In March 2017, it was reported that her cough had been treated with antibiotics with good results, but that

---

[2] Claimant cites to a medical publication for the statement that a normal resting oxygen saturation of 95% or greater is considered normal.  (Doc. 18 at 6)

her "illness came back." (*Id.* at 12)  Her SpO2 saturation level was 99%.  (*Id.* at 14)  She was noted to complain of pain in her back radiating down her legs, but her review of systems was negative for musculoskeletal issues.  (*Id.*at 16-17)  She exhibited a normal range of motion and normal mood and affect.  (*Id.* at 17)  She was not in any respiratory distress but had "wheezes." (*Id.*)  In April 2017, Claimant complained of memory loss and decreased concentration.  (*Id.* at 33)  Her SpO2 level was measured at 99%.  (*Id.*)  She was noted to have no pain, and demonstrated normal mood, affect, and behavior.  (*Id.* at 33-34)  During a sleep study, Claimant tested negative for obstructive sleep apnea.  (*Id.* at 45)

A pulmonary function test conducted in May 2017 identified a baseline SpO2 level of 94%.  (*Id.* at 54)  Claimant denied leg edema.  (*Id.* at 70)  She demonstrated a normal gait.  (*Id.*at 72)  Her musculoskeletal review was negative, with a normal range of motion.  (*Id.* at 80)  She exhibited normal mood and affect.  (*Id.*)  On May 15, 2017, Claimant complained of chronic back pain, but she displayed normal gait and station.  (*Id.* at 84)  In July 2017, Claimant's SpO2 was measured at 99%.  (Doc. 15-9 at 10)  She was encouraged to perform aerobic exercise and walking.  (*Id.* at 11)  No lower extremity edema was observed, and Claimant's mood and affect were normal.  (*Id.* at 15)  On July 18, 2017, while being evaluated for bradycardia, Claimant reported no shortness of breath, no swelling in her hands or feet, and no dizziness, headaches, fatigue or pain.  (*Id.* at 28)  She reported memory issues such as forgetting where she placed her keys or wallet.  (*Id.* at 29)  She had a normal gait.  (*Id.* at 30)  On July 21, 2017, Claimant's physical examination indicated a SpO2 level of 96% and she reported hip pain.  (*Id.* at 34)  She exhibited a normal range of motion but displayed an anxious mood.  (*Id.*)  She was implanted with a pacemaker on September 13, 2017, to address symptoms of bradycardia.  (*Id.* at 45)  Two weeks post-implant, Claimant reported she felt better, slept better, had less anxiety, and thought her memory was improving.  (*Id.* at 79)

In October 2017, Claimant exhibited normal range of motion, normal behavior, mood, affect, thought content and judgment.  (*Id.* at 89)  In November 2017, her SpO2 measured 100% and she was reported to be in no pain.  (*Id.* at 95)  In February 2018,

Claimant was seen at urgent care for a headache lasting one week. (*Id.* at 99) Her treatment notes included her reports of back pain radiating to her flanks and abdomen that worsened with walking. (*Id.* at 99) The review of symptoms indicated decreased range of motion and tenderness in her neck. (*Id.* at 101) Later in February 2018, Claimant complained about feeling overwhelmed, her desire to not leave home, and forgetfulness. (*Id.* at 106) She was seen in March 2018 for her complaint of memory changes. (*Id.* at 113-114) Her assessment indicated: normal attention span, concentration, and fund of knowledge; good immediate memory and recall of 2 out of 3 items after 5 minutes; a mini-mental examination score of 24/30, including loss of 4 points for counting numbers backwards; normal muscle tone; 5 of 5 muscle strength throughout; and normal gait and stance. (*Id.*) The doctor noted memory changes that he attributed to depression and anxiety. (*Id.* at 114) Claimant also reported pain in her back and neck at a level of 3 out of 10 and said she was using ibuprofen and baths to relieve her pain. (*Id.* at 115)

On March 21, 2018, Claimant presented complaining of chest pain and shortness of breath on exertion and when lying on her back, but without edema, fainting or heart palpitations. (*Id.* at 119) Her SpO2 level was 98%. (*Id.*) She was nervous and anxious. (*Id.*) On March 27, 2018, Claimant's SpO2 was 99%. (Doc. 15-11 at 122) She displayed a normal range of motion in her musculoskeletal system and normal mood and affect. (*Id.*) On April 9, 2018, a functional status assessment indicated that Claimant reported she did not have serious difficulty walking or climbing stairs, or "difficulty doing errands alone such as visiting a doctor's office or shopping," or difficulty remembering, concentrating, or making decisions. (Doc. 15-12 at 20, 27)

### 2. *Sun Pain Management & Spine Specialists*

Claimant was seen for pain management in this practice between April 2017 and March 2018. (Doc. 15-8 at 52-84) In April 2017, Claimant complained of pain in her neck, back, and bilateral legs, knees, and shoulders. (*Id.* at 81) David Towns, M.D., recorded that Claimant said her pain had begun approximately 4 years previously, when she was still working, and that she had been prescribed a muscle relaxant, a narcotic,

ibuprofen, and a nerve pain medication.  (*Id.*)  Claimant reported she had tried physical therapy two years before but "did not find it helpful" and was not interested in "injection therapy as she has heard bad things about it."  (*Id.*)  Dr. Towns stated he would continue to educate her about the potential benefits of injection therapy.  (*Id.*)  Claimant declared her pain was aggravated by standing, sitting, walking, bending, stooping, twisting and lying on her side, but denied balance difficulty, anxiety or depression.  (*Id.* at 82-83)  Her physical examination indicated full range of motion and normal strength in her bilateral upper and lower extremities.  (*Id.* at 83)

In May 2017, she said she had balance issues and felt lightheaded first thing in the morning.  (*Id.* at 79)  She requested a walker because of this lightheadedness and because she had fallen.  (*Id.*)  She advised the doctor that her medications were helping to keep her "active and functional throughout the day" without side effects.  (*Id.*)  In August 2017, Claimant reported repeated falls.  (*Id.*at 69-70)  Her SpO2 level was 99%.  (*Id.* at 66)  In November 2017, Claimant complained of headaches and was told that her self-reported failure to consistently take medications could cause headaches.  (*Id.* at 64)  In December 2017, her provider noted Claimant had been out of town on a family emergency, had missed her appointment and was out of her medications.  (*Id.* at 59)  Her SpO2 saturation was 97%.  (*Id.* at 60)  Claimant's general appearance was observed to be "normal, pleasant, alert, well-hydrated/nourished, comfortable, in no acute distress, calm and relaxed, cooperative."  (*Id.* at 60)  She had a normal neurologic exam, including normal gait.  (*Id.*)  In February 2018, Claimant was referred for physical therapy and was counseled to increase her activity level gradually and to consider proceeding with injection therapy.  (*Id.* at 55-56)  In March 2018, Claimant complained of bilateral wrist pain with bilateral Tinel's sign.  (*Id.* at 53)

Overall, while Claimant was treated at this practice, her psychological assessments consistently indicated good judgment and insight, good thought content, and that she was alert and oriented.  (*Id.* at 52-84)  She also consistently exhibited focal tenderness cervical/lumbar facet loading maneuvers, left knee tenderness but also a full range of

motion, and full strength bilaterally in her upper and lower extremities. (*Id.*) She denied anxiety and depressed mood. (*Id.*)

### 3. Terros, Inc.

Claimant was first seen on April 5, 2018, for a core assessment and risk assessment of her complaints of depression and anxiety in order to obtain medication to reduce her symptoms. (Doc. 15-12 at 10-17) Claimant reported she would like to "be happier as she needs to take care of grandchildren and that requires a lot of work." (*Id.* at 12) She stated she was prone to anxiety attacks and that she was often tired. (*Id.*) Impressions of her assessment included: unremarkable thought process; normal motor movement and gait; fair judgment; oriented to person, place and time; fair attention span and concentration; and depressed mood and tearful affect. (*Id.* at 15) She was prescribed medications for depression and anxiety. (*Id.* at 16)

### 4. Medical records dated after ALJ's decision

After her May 3, 2018, hearing, Claimant submitted medical records dated between June 11 and July 20, 2018. (Doc. 15-3 at 37-39, 51-57, 59-82) In its October 22, 2018, denial of Claimant's request for review of the ALJ's July 19, 2018 decision, the Appeals counsel reviewed this record and determined it "did not show a reasonable probability that it would change the outcome of the decision." (*Id.* at 3) The evidence included Dr. Cory Bushmann's July 19, 2018, order for a motorized power scooter on a diagnosis of Claimant's gait instability (*Id.* at 39), and instructions for use of a medication intended to help patients quit smoking (*Id.* at 59-63). The records also included Claimant's office visits with the Banner Health Internal Medicine Office. On June 30, 2018, Claimant was seen for a "lobular mass on the left parapharyngeal space depression" in the neck, and for memory loss. (*Id.* at 64-67) She reported that her forgetfulness had "been getting worse within the past month to where her . . . daughter and her daughter's husband have moved in to help her take care of the house."[3] (*Id.* at 64) A mini-mental examination resulted in

---

[3] At her hearing, Claimant testified that her daughter, son-in-law and their three children had moved in with her in December 2015. (Doc. 15-3 at 111)

a score of 28 out of 30.  (*Id.*)  Her physical exam indicted an SpO2 level of 97%, normal range of motion and full strength in her musculoskeletal system with, no tenderness or swelling, and appropriate mood and affect.  (*Id.* at 65)  It was noted that Claimant's depression was "controlled" but that she "would like to see psychiatry to follow up with her medications."  (*Id.* at 66)  On July 9, 2018, Claimant's SpO2 level measured 97%, she demonstrated appropriate mood and affect, and she exhibited normal range of motion and strength with no tenderness or swelling.  (*Id.* at 73)

The Appeals Council also advised Claimant that the medical records she had submitted that were dated between August 1 and October 12, 2018, and which post-dated the ALJ's July 19, 2018 decision, did not "impact the decision about whether [Claimant was] disabled beginning on or before July 19, 2018."  (*Id.* at 3)  These records consisted of 13 pages of medical records including: a statement from a surgeon with Banner Health who planned to remove the mass in her neck in October 2018 (*Id.* at 36); impressions from a CT scan of Claimant's neck conducted in September 2018 (*Id.* at 40-41); records of an August 2018 office visit after Claimant apparently fainted (*Id.* at 42-50); and what appears to be a receipt for the delivery to Claimant of a motorized scooter (*Id.* at 58).

### 5. *Imaging*

On June 20, 2017, Claimant underwent a cervical spine MRI.  (Doc. 15-8 at 85-86) The impressions from the imaging included:  (1) spondylosis and disc bulging at the C3-4, C5-6, and C6-7 levels; (2) a congenitally small spinal cord canal without impingement on the cord; and (3) "left paramedian to lateral extending broad-based disc protrusion and osteophyte complex, C5-6 level without nerve root displacement or central canal narrowing[, and] [m]oderate left foraminal stenosis."  (*Id.* at 86)

On June 20, 2017, imaging also was performed on Claimant's lumbar spine.  (*Id.* at 88-89)  The impressions on review of the MRI included:  (1) "Grade 1 anterolisthesis of approximately 8 mm at the L5-S1 level with probable bilateral pars intra-articularis defects[ and] [d]isc uncovering with slight disc herniation in conjunction with mild facet arthropathy [which] results in moderate bilateral neural foraminal stenosis at this level[,

along with] . . . mass effect on the ventral thecal sac without overt stenosis"; (2) mild to moderate spondylosis in the lower lumbar spine and slight herniation and desiccation and slight herniation of the L3-4 and L4-5 discs without significant central canal or neural foraminal stenosis; and (3) "slight gentle levoscoliosis of the lumbar spine." (*Id.* at 89)

Claimant's left knee was x-rayed on August 16, 2017 and was reviewed as "unremarkable." (*Id.* at 87)

On April 24, 2018, Claimant underwent an MRI of her brain. (Doc. 15-12 at 98) Findings included "mild chronic microvascular changes involving subcortical and periventricular white matter." (*Id.*)

Also on April 24, 2018, an MRI procedure of Claimant's left knee indicated "a complex tear of the medial meniscus with displacement of the anterior horn tear into the anterior aspect of the intercondylar notch." (*Id.* at 99) Additionally, the imaging indicated "significant thinning of the ACL compatible with remote high-grade partial tear. PCL is intact." (*Id.*)

### C. Medical source statements

#### 1. *John Porter, M.D.*

After his initial consultation with Claimant on May 22, 2018, Dr. Porter completed a "Physical Residual Functional Capacity Questionnaire regarding her abilities on that same day. (Doc. 15-12 at 101-105) The record does not indicate that Dr. Porter ever treated Claimant. Dr. Porter opined that: Claimant's pain was frequently severe enough to interfere with concentration and attention needed to perform simple work tasks. (*Id.* at 102) He further indicated that Claimant was incapable of performing even low stress jobs because of her depression, anxiety and pain. (*Id.*) Dr. Porter estimated that Claimant was capable of: walking one-quarter of a city block without rest or severe pain; sitting for 15 to 20 minutes before needing to get up; standing for 10 to 15 minutes before needing to sit down; sitting for about 4 hours in an 8-hour work day; and standing and/or walking for less than 2 hours in an 8-hour work day. (*Id.* at 102-103) He further opined that during an 8-hour work day Claimant would need to walk around every 5 minutes for 5 minutes. (*Id.* at

103) Dr. Porter indicated that Claimant required a job that allowed her to shift positions at will and would need to take unscheduled breaks every hour for 5 minutes, and that with prolonged sitting her legs should be elevated. (*Id.*) He opined that for standing and/or walking, Claimant should use a walker. (*Id.*) He further estimated that Claimant could lift and carry items weighing 20 pounds rarely, and items weighing 10 pounds or fewer occasionally. (*Id.*) The doctor indicated that Claimant could occasionally look down, turn her head right or left, or look up, but could only rarely hold her head in a static position. (*Id.* at 103-104) He also concluded that Claimant was rarely able to twist, stoop or bend, and could never crouch or squat, climb ladders, or climb stairs. (*Id.* at 104) Dr. Porter stated that during an 8-hour work day, Claimant could use her hands to grasp, turn, or twist objects for 2 hours; use her fingers for fine manipulation for 4 hours; and use her arms to reach for objects for fewer than 2 hours. (*Id.*) He declared that Claimant would need to miss more than 4 days of work per month because of her impairments or treatment. (*Id.*) He further stated that Claimant would need to avoid temperature extremes, wetness and humidity, dust, fumes, and gases because of her COPD. (*Id.*) The doctor estimated that the described limitations applied beginning in about 2014. (*Id.*)

### D. Examining consultant evaluation

#### 1. *Maryann T. Latus, Ph.D., Clinical Psychologist*

In July 2015, Claimant was evaluated by clinical psychologist Dr. Latus on referral from the state agency. (Doc. 15-8 at 39-43) Dr. Latus documented that Claimant alleged COPD, Hepatitis C, memory loss and depression. (*Id.* at 39) Claimant reported receiving psychiatric treatment as a young teenager for "being uncontrollable and [her] attitude." (*Id.* at 40) Claimant complained of sleep disturbance, anxiety, short-term and long-term memory loss, with difficulty concentrating, and feelings of depression. (*Id.*) Claimant reported she was unemployed due to nerve problems, fatigue, COPD and inability to concentrate. (*Id.* at 41) Claimant said that she did not require assistance in bathing, personal hygiene, grooming or dressing and spent her days caring for her grandchildren, house cleaning, doing laundry and cooking. (*Id.*) She stated she left the house a few times

each week, was able to drive and use public transportation. (*Id.*) Claimant said she did not have friends, but attended church services regularly, was married but separated and had been living with her daughter for several years. (*Id.*)

Dr. Latus observed that Claimant maintained good eye contact, did not appear to be in any pain, and sustained attention during her evaluation. (*Id.*) The doctor further noted that Claimant demonstrated good comprehension, logical thinking, normal processing speed, intact memory and adequate energy level. (*Id.* at 41-42) Claimant's mood was slightly depressed and she was tearful, particularly when describing the deaths of two of her grandchildren. (*Id.*at 42) Dr. Latus recorded that Claimant was cooperative, friendly, engaging, and apparently of average intelligence. (*Id.*) Claimant scored 30 out of 30 on the mini-mental exam.

Dr. Latus concluded that Claimant did not meet diagnostic criteria for cognitive disorder but did meet the diagnostic criteria for a "persistent depressive disorder." (*Id.*) The doctor also indicated that Claimant "seems to meet the criteria for an adjustment disorder with anxiety." (*Id.* at 43) She further concluded that Claimant's symptoms "appear[ed] to be impacting her functioning in that she would have difficulty concentrating[.]" (*Id.*) Dr. Latus completed a psychological/psychiatric medical source statement concluding that Claimant: (1) suffered no impairment in her ability to understand and remember detailed instructions and work-like procedures; (2) demonstrated sustained persistence; (3) was tearful when discussing her grandchildrens' deaths; and (4) had no impairment in adapting to change. (*Id.* at 44)

### E.    State agency non-examining consultant assessments

#### 1.    *Matthew A. Meier, Psy.D. and Neil Sapin, M.D.*

On initial review of Claimant's application, non-examining consultative reviewers Matthew A. Meier, Psy.D. and Neil Sapin, M.D., considered Claimant's records received as of July 28, 2015 (Doc. 15-4 at 13-21), including the evaluation by Dr. Latus, and concluded that based on the available record, Claimant was not disabled on either psychological or physical limitation grounds. (*Id.* at 21) They noted that Claimant had

1  failed to appear at a scheduled medical consultative examination without notifying the
2  agency of any reason for her absence.  (*Id.*)

3      2.      *Jamie Bludworth, Ph.D. and Marilyn Orenstein, M.D.*

4      On reconsideration, the reviewers examined records received as of December 11,
5  2015.  (Doc. 15-4 at 24-34)  The records reviewed on reconsideration were the same as
6  those considered on initial review.  (*Id.*)  The reviewers again concluded that the record did
7  not support a finding of disability.  (*Id.* at 34)

8  **II.      STANDARD OF REVIEW**

9      Under 42 U.S.C. § 405(g), this court must affirm the Commissioner's decision to
10  adopt the ALJ's findings if his findings are supported by substantial evidence and are free
11  from reversible error.  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).  "Substantial
12  evidence is more than a mere scintilla, but less than a preponderance."  *Tidwell v. Apfel*,
13  161 F.3d 599, 601 (9th Cir. 1998).  "It is 'such relevant evidence as a reasonable mind might
14  accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401
15  (1971) (quoting *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938)).

16      In determining whether substantial evidence supports the ALJ's decision, the court
17  considers the whole record, weighing both the evidence that supports and that which
18  detracts from the ALJ's conclusions.  *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998).
19  The ALJ is responsible for resolving conflicts in medical testimony, ambiguity in the
20  record, and determining credibility.  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir.
21  1995).  If there is sufficient evidence to support the ALJ's outcome, the Court cannot
22  substitute its own determination.  *See Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990).
23  Although the Court "must do more than merely rubberstamp the ALJ's decision[,]" *Winans*
24  *v. Bowen*, 853 F.2d 643, 645 (9th Cir. 1988), where the evidence is susceptible to more than
25  one rational interpretation, the ALJ's decision must be upheld.  *Magallanes v. Bowen*, 881
26  F.2d 747, 750 (9th Cir. 1989) (citations omitted).

27  . . .

28  . . .

## III.   LEGAL STANDARDS

Claimant bears the burden of proving disability under the Social Security Act. *Tidwell v. Apfel*, 161 F.3d at 601.  She meets this burden if she can establish that she has a physical or mental impairment that prevents her from engaging in any substantial gainful activity and which is expected to result in death or to last for a continuous period of at least one year.  42 U.S.C. §§ 423(d)(1) and 1382c(a)(3)(A).  Claimant's impairments must be such that she is not only unable to perform her past relevant work, but she cannot, considering her age, education and work experience, engage in other substantial gainful work existing in the national economy.  *Id.* at §§ 423(d)(2) and 1382c (a)(3)(B).

The Commissioner applies a five-step sequential process to evaluate disability.  20 C.F.R. §§ 404.1520 and 416.920.  In the first three steps, the Commissioner determines: (1) whether a claimant has engaged in substantial gainful activity since the alleged onset; (2) whether she has a "severe" impairment or a combination of impairments that is "severe"; and (3) whether the severity of any impairment meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R. Pt. 404, Subpt. P, App. 1).  *Id.*  If a claimant complies with these three steps, she will automatically be found disabled; if the claimant satisfies steps one and two but not three, she must then satisfy step four.  *Id.*

Before considering step four, the ALJ must assess the claimant's residual functional capacity ("RFC"), *see* 20 C.F.R. § 404.1520(a)(4)(iv), which is "the most [the claimant] can still do despite [the claimant's] limitations." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1097 (9th Cir. 2014) (quoting 20 C.F.R. § 404.1545(a)(1)).  The RFC assessment is "based on all the relevant medical and other evidence" in the claimant's record.  *Id.* (quoting 20 C.F.R. § 404.1520(e)).  In determining a claimant's RFC, the ALJ must consider all of a claimant's medically determinable impairments, including those that are not severe.  20 C.F.R. § 404.1545(a)(2).

At step four, the ALJ considers the claimant's RFC and past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If a claimant can perform her past relevant work, she is not found to be disabled.  *Id.*

When a claimant satisfies step four, the burden shifts from her to the Commissioner to establish the claimant is able to perform work in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (claimant bears the burden of proof on the first four steps, but the burden shifts to the Commissioner at step five). The fifth and final step involves the ALJ's decision whether a claimant can make an adjustment to other work, given the ALJ's assessment of the claimant's RFC and age, education and work experience. 20 C.F.R. § 404.1520(a)(4)(v).

## IV. THE ADMINISTRATIVE HEARING

The ALJ conducted a hearing on Claimant's application on May 3, 2018. (Doc. 15-3 at 83-143) Claimant confirmed she graduated from high school with a GED. (*Id.* at 90) Counsel for Claimant stated that Claimant's past relevant work consisted of property management from about 1995 through 2006 and commercial freight truck driving from 2006 through 2014. (*Id.*) Claimant testified that she lived with her adopted grandchildren, a daughter and son-in-law. (*Id.* at 94) She said her source of income was an adoption subsidy from the Arizona Department of Economic Security. (*Id.* at 95) She explained that she did not drive and had not had a driver's license since her commercial driver's license expired in 2015 after she couldn't pass a physical examination. (*Id.* at 96) Claimant declared that she last worked in March 2014. (*Id.* at 98) Her most recent driving job did not require her to load or unload cargo. (*Id.* at 99) She explained that a requirement for some of her prior driving jobs had been to load and unload cargo that weighed between 50 and 75 pounds. (*Id.* at 101)

Claimant stated that as a property manager, she had managed apartment complexes of 120 units and had supervised a staff of other employees. (*Id.* at 105) Her duties included writing up lease agreements, collecting rent, and serving notices. (*Id.* at 106) She also testified she attempted to work at a grocery store in 2014 but found she was unable to stand for the time periods the job required. (*Id.* at 107) She explained she had to quit after she was diagnosed with Hepatitis C because her job required her to handle food. (*Id.*) She stated she subsequently did not apply for other jobs. (*Id.* at 108) Responding to a question

- 13 -

from the ALJ, Claimant said she had done no volunteering outside of her home since her alleged onset of disability date almost four years prior.  (*Id.* at 109)

Claimant testified that her household included six grandchildren, her daughter who was not employed, and her son-in-law who was employed.  (*Id.* at 110)  She explained that her adopted grandchildren moved in with her in May 2014.  (*Id.* at 111)  She said she lived alone with her adopted three grandchildren until December 2015, when her daughter, son-in-law, and their three children also moved in with her.  (*Id.*)  Claimant declared she had attended school-related events such as parent-teacher conferences.  (*Id.* at 112)  She stated she had not traveled out of state since 2014, and that she received food stamps and obtained health care through Arizona Access.  (*Id.* at 114-115)  She responded that she smoked under a pack of cigarettes a day, which was down from two packs a day a year or two previously.  (*Id.* at 115)  Claimant testified she had last used alcohol in 2006 and had not used methamphetamines for twenty years.  (*Id.*at 116)

Claimant explained that her physical condition took a turn for the worse beginning in December 2015, when she experienced pain in her back and legs causing her dizziness and inability to stand or sit for long periods and made it difficult to sleep or feel rested.  (*Id.* at 117-118)  She reported suffering abnormally low heart rate that was diagnosed as the cause for her sleeplessness, with subsequent implantation of a pacemaker in September 2017.  (*Id.* at 118)  Claimant detailed changes to her activity level including that she no longer did laundry or grocery shopping, did not go to the school, and could not get around as well.  (*Id.* at 119)  She said she was on 25 or 26 medications, that her memory was beginning to "slip," and that she had problems with her left knee.  (*Id.*)  Claimant said she was able to attend to her own bathing and grooming and could feed herself.  (*Id.*)  She reported spending her time watching criminal shows on television, taking her dog outside to the front porch and sometimes going to the park as a family.  (*Id.*at 121)  Claimant explained she had a significant other for eight or nine years who lived with her from 2014 to 2015 before she made him move out.  (*Id.* at 122)

On questioning by her counsel, Claimant reported she could stand in one place for 15 minutes, but then would need to sit and lie down for 45 minutes before she could stand again.  (*Id.* at 123-124)  Claimant averred she could sit for 5 to 10 minutes before having to stand or lie down, and would need to stand and lie down for 30 to 45 minutes before she could sit for another 10 minutes.  (*Id.* at 125)  She estimated the heaviest weight she could lift was a gallon of milk.  (*Id.*)  Claimant said her medications took the edge off her pain and that she did not want to go on heavier medication.  (*Id.*)  She stated her medications made her feel "blah" and that she tried to alternative between ibuprofen and narcotic painkillers as much as she could.  (*Id.* at 126)  Claimant said she had received no treatment for Hepatitis C, because her insurance was unwilling to pay for it.  (*Id.* at 127)

Claimant explained she had made appointments for MRIs on her knee and neck in the near future, and that arranging these imaging procedures was complicated because a representative of the pacemaker device company would have to be present.  (*Id.* at 128)  She also discussed that she would have her wrists x-rayed on the same day she underwent the MRIs.  Claimant also mentioned having recently been evaluated for anxiety and depression.  (*Id.* at 129-130)  She further discussed experiencing panic attacks, the most recent having been two weeks prior, while she was at a store.  (*Id.* at 131)  She said the attacks only occurred when she was away from home.  (*Id.* at 132)  The ALJ followed up and asked Claimant if she had experienced any issues with focus or being on task around her adoptive children that might have put them at risk.  (*Id.* at 133)  Claimant denied any such circumstance, but also indicated that her memory lapses may be caused by her recent development of high cholesterol and high blood pressure.  (*Id.*)  She opined that her mental health issues were disabling, and "drastically worse" than in 2015.  (*Id.* at 134-135)

The ALJ announced that he needed additional evaluation of Claimant's physical and mental functioning before he could make a disability determination.  (*Id.* at 136-137)  The ALJ said that Claimant's treating physicians should be able to provide evaluation and functional assessment.  (*Id.* at 139)  The ALJ advised Claimant's counsel that he wanted to review residual functional capacity assessments rather than conclusory opinions.  (*Id.* at

140)  The ALJ further advised counsel that the evidence "may give rise to a later onset date" and encouraged counsel to bear that in mind.  (*Id.* at 142)

## V.    ALJ's DECISION

The ALJ issued his unfavorable decision on July 19, 2018.  (Doc. 15-3 at 14-29) He documented that after Claimant's hearing, he received additional evidence that he admitted in the record and stated he had

> proffered this evidence to the claimant on May 10, 2018, and informed her of her right to submit written comments concerning the evidence, submit a written statement as to the facts and law she believes applies to the case in light of that evidence, submit additional records she wishes me to consider, or request a supplemental hearing.

(Doc. 15-3 at 18)  The ALJ noted he had not received a response from Claimant.  (*Id.*)  The ALJ stated that Claimant's date last insured was determined to be September 30, 2018, meaning Claimant must establish disability on or before that date to qualify for benefits. (*Id.* at 18, 20)  The ALJ concluded Claimant had not engaged in substantial gainful activity since March 3, 2014, which was Claimant's alleged onset date.  (*Id.* at 20)

The ALJ found that Claimant suffered from the severe impairments of:  cervical and lumbar osteoarthritis/spondylosis.  (*Id.*)  The ALJ further found that Claimant experienced the non-severe impairments of:  gastroesophageal reflux disease, bradycardia (status-post pacemaker placement in 2017), kidney stone, chronic obstructive pulmonary disease with tobacco dependence, acute upper respiratory infection bronchitis, non-displaced left knee meniscus tear, and mild microvascular disease.  (*Id.*)  Additionally, the ALJ indicated Claimant did not have a single impairment or a combination of impairments meeting or equaling the severity of a listed impairment.  (*Id.* at 20, 23)  The ALJ further determined that Claimant's "medically determinable mental impairments of major depressive disorder and adjustment disorder with anxiety, considered singly and in combination, do not cause more than minimal limitation [in her] ability to perform basic mental work activities and are therefore nonsevere."  (*Id.* at 21, 23)  The ALJ discussed references in the record to bilateral wrist pain, a history of Hepatitis C and bilateral hip pain, but concluded that

because there was no record of treatment for these conditions and no evidence of the conditions from an acceptable medical source, they did not represent medically determinable impairments. (*Id.* at 23)

The ALJ found that Claimant retained the residual functional capacity ("RFC") to "perform the full range of light work as defined in 20 CFR. 404.1567(b) and 416.967(b). (*Id.* at 23-24) Moreover, the ALJ found that Claimant maintained the RFC to perform her past relevant work as a property manager. (*Id.* at 27) Alternatively, the ALJ concluded there were jobs in the national economy in significant numbers she was capable of performing. The ALJ declared that Claimant had not "been under a disability, as defined in the Social Security Act, from March 3, 2014, through the date of this decision." (*Id.* at 28)

## VI.    DISCUSSION

As noted, Claimant argues the ALJ erred by:  (1) assigning little weight to the opinions of John Porter, M.D., set forth in a Physical Residual Functional Capacity Questionnaire dated May 2018; and (2) improperly rejecting Claimant's testimony regarding her pain, symptoms, and level of limitation. (Doc. 18 at 4-16) Each argument is addressed in turn.

### A.    The ALJ did not err by rejecting the opinions of John Porter, M.D.

The ALJ accorded only "little weight" to the opinions of Dr. Porter because he concluded the doctor's opinions were "inconsistent with the medical evidence." (Doc. 15-3 at 26-27) In support of this conclusion, the ALJ declared that Claimant's "objective examinations were consistently normal," and a spirometry test indicated only mild obstruction. (*Id.*) The ALJ found Dr. Porter's findings of postural, exertional, and manipulative limitations lacked support in the medical record, which instead indicated "normal range of motion in her neck and back; full strength in the bilateral upper and lower extremities; and normal gait." (*Id.*) The ALJ additionally stated, "I do note, however, that the claimant frequently reports complaints of pain and her providers occasionally note tenderness in the cervical and lumbar paraspinous, as well as pain with cervical and lumbar

facet load maneuvers. Accordingly, I have limited the claimant to the light exertional level." (*Id.*) The ALJ concluded there was no record support for Dr. Porter's conclusion that Claimant would miss more than four work days each month, citing instead to evidence that Claimant repeatedly reported her pain medication helped her maintain activities of daily living, "improved her quality of life, and helped her keep active and functional throughout the day." (*Id.*)

As an initial matter, although the ALJ referred to Dr. Porter as a "treating provider," the record does not support such a conclusion. Although Dr. Porter practiced within the Maricopa Integrated Health Systems Group (Doc. 15-12 at 105), and the record indicates this group provided medical care to Claimant from May to November 2017 and from February 2017 to April 2018 (*see* Section I.B above), Dr. Porter documented within his RFC Questionnaire that his initial consultation with Claimant was on the same day he filled out the questionnaire. (Doc. 15-12 at 101) Under 20 C.F.R. section 404.1527(a)(2), a treating source is an acceptable medical source who has "an ongoing treatment relationship" with a patient. 20 C.F.R. § 404.1527(a)(2). Further, an acceptable medical source is not considered a patient's treating source in situations where the patient's "relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your clam for disability. In such a case, we will consider the acceptable medical source to be a nontreating source." *Id.* Nevertheless, the ALJ is required to evaluate every medical opinion he receives. 20 C.F.R. § 404.1527(b). An ALJ "'need not accept the opinion of any physician, including a treating physician, if that opinion is . . . inadequately supported by clinical findings.'" *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (quoting *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002)).

In determining how much deference to give a physician's medical opinion, the Ninth Circuit distinguishes between the opinions of treating physicians, examining physicians, and non-examining physicians. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). Generally, an ALJ should give the greatest weight to a treating physician's opinion and

more weight to the opinion of an examining physician than a non-examining physician. *See Andrews v. Shalala*, 53 F.3d 1035, 1040-41 (9th Cir. 1995); *see also* 20 C.F.R. § 404.1527(c)(1)-(6) (listing factors to be considered when evaluating opinion evidence, including length of examining or treating relationship, frequency of examination, consistency with the record, and support from objective evidence). Here, the ALJ accorded little weight to the state agency non-examining medical consultants' opinions because they concluded there was insufficient evidence in the record at the time of their review to evaluate the claim on physical impairment, and the ALJ found that "additional evidence at the hearing level indicates that the claimant indeed has medically determinable impairments." (Doc. 15-3 at 26) The record contains no opinions on Claimant's physical limitations by any treating doctor. Further, the ALJ did not accord more than "little weight" to the opinions on Claimant's physical limitations of any examining or non-examining doctor.

Claimant cites to the record to rebut the ALJ's conclusion that Claimant's symptoms from her COPD were not disabling. (Doc. 18 at 6) Claimant first indicates that in July 2014, she complained of shortness of breath and presented with wheezes. (*Id.*) The record on that visit indicates that Claimant reported she had been out of her medication. (Doc. 15-8 at 19) Her oxygenation level was between 96% and 98%, and her physical exam described her breathing effort as normal without rapid respiration or respiratory distress, no rhonchi and no rales. (*Id.* at 19-20) Claimant next indicates that in November 2014, she was seen for a 3- to 4-day history of upper respiratory tract congestion accompanied by green mucous, increased cough and increased shortness of breath, all of which were symptoms that were outside her baseline for COPD and suggested an infection. (Doc. 15-11 at 3) Claimant next notes that in March 2017, she exhibited "scattered rhonchi and wheezing, fair but equal chest excursion, and coughing spasm." (Doc. 18 at 6) She sought treatment after having a productive cough for a week and after recently having been treated with antibiotics which had helped but then the "illness came back." (Doc. 15-11 at 12) Despite her symptoms of infection, her SpO2 levels were between 99% and 100%. (*Id.* at

14) She was directed to follow "symptomatic therapy" including increasing fluids and salt gargles and was told to return if her symptoms did not improve as anticipated. (*Id.*) Additionally, Claimant details that during a routine follow up appointment in April 2017, she reported cough, shortness of breath and wheezing. (Doc. 18 at 6) Her physical examination, however, indicated her oxygenation level was measured at 98%, her breathing effort was normal and she was under no respiratory distress, although she had wheezes. (Doc. 15-11 at 60) Claimant next states that she was positive for cough in May 2017. (Doc. 18 at 6) At the same time, she reported no shortness of breath or wheezing, and her physical exam indicated a blood oxygenation level of 100%. (Doc. 15-11 at 80) Finally, Claimant declares that while her "oxygen saturation level was average at times, it reached 92 percent in March 2018." (Doc. 18 at 6) Claimant's characterization of her usual oxygen saturation level is not supported by the record. Other than the recordings of oxygen saturation of 92% on March 12, 2018 (Doc. 15-8 at 52) and June 11, 2018 (Doc. 15-3 at 78), and a reading of 94% in May 2017 (Doc. 15-11 at 54), all of the rest of Claimant's numerous oxygen saturation readings were normal, that is, at readings of 95% or above. (Doc. 15-3 at 65, 70, 73; Doc. 15-8 at 7, 20, 57, 60, 63, 66, 69, 72, 75, 78, 83; Doc. 15-9 at 10, 15, 30, 34, 39, 46, 80, 84, 89, 95, 101, 107, 119; Doc. 15-11 at 4, 7, 14, 17, 29, 33, 52, 59, 72, 80, 122)

Contrary to Claimant's argument, the ALJ did not ignore material evidence of Claimant's breathing problems, but instead reasonably concluded, based on the record, that these problems did not contribute to a finding that she was disabled.

To support Claimant's argument that the ALJ erred in rejecting Dr. Porter's opinions on the disabling effect of her exertional limitations, she states that Dr. Porter "cited to [Claimant's] symptoms as well as MRI studies." (Doc. 18 at 8) Claimant then: (1) summarizes the impressions from her MR imaging of her spine and left knee; (2) states that Claimant was prescribed a walker, suffered temporary chest pain after being implanted with a pacemaker, presented with cervical and thoracic paraspinal tenderness in December 2017, had neck pain resulting in headache in February 2018, reported feelings of being

overwhelmed and fear of leaving her house, began to report wrist pain in March 2018, and scored poorly on a March 2018 mini-mental examination; and (3) further details that she presented with symptoms of depression and low energy in March 2018, that a March 2018 MRI indicated mild chronic microvascular disease in her brain, and that she appeared "very overwhelmed" in June 2018. (*Id.* at 8-10) Claimant concludes "[t]he ALJ's recitation of the evidence to reject Dr. Porter fails to adequately consider the combined effect [Claimant's] impairments have on her functional capacity." (*Id.* at 10)

The ALJ's decision indicates that he assessed and considered each of the aspects of Claimant's medical history she detailed in her discussion of Dr. Porter's opinion. The ALJ noted that Claimant's brain MRI indicated evidence of mild chronic microvascular disease but concluded the record did not include evidence of treatment of this condition or identify any limitations associated with the condition. (Doc. 15-3 at 21) The record supports this assessment.

The ALJ further addressed Claimant's reports of left knee pain and her April 2018 MRI indicating damage to the knee. (*Id.* at 21) The ALJ observed the record indicated neither any treatment for this condition nor "objective examinations" indicating "limitations caused by this impairment." The record prior to the ALJ's July 2018 decision repeatedly documented Claimant's demonstration of normal gait. (*See* Doc. 15-11 at 72 (May 2017), 84 (May 2017); Doc. 15-9 at 30 (July 2017), 114 (March 2018); Doc. 15-12 at 15 (April 2018)). In April 2018, Claimant denied she had "serious difficulty walking or climbing stairs." (Doc. 15-12 at 20) As noted above, evidence of Dr. Cory Bushmann's July 19, 2018, order for a motorized power scooter on a diagnosis of Claimant's gait instability was not part of the record before the ALJ and the Appeals Council determined this evidence would not likely have changed the outcome of the ALJ's decision. (Doc. 15-3 at 3, 39)

Regarding Claimant's limitations arising from symptoms of depression and anxiety, the ALJ concluded that these impairments, taken singly and in combination, did not "cause more than minimal limitation in the claimant's ability to perform basic mental work

activities[.]" (*Id.* at 21)  In support of this conclusion, the ALJ noted that Claimant had first sought treatment for these impairments only one month prior to her hearing and that the record consistently reflected observations of her "normal mood, affect, behavior, judgment, and thought content." (*Id.* at 21-22)  As noted above, the record supports the ALJ's conclusion. (*See, e.g.,* Doc. 15-11 at 58, 17, 72; Doc. 15-9 at 11, 89; Doc. 15-11 at 122; Doc. 15-8 at 53)

Addressing Claimant's spinal impairments, the ALJ concluded that imaging on Claimant's spine supported the finding that she has an impairment "that more than minimally limits her ability to perform work activity." (Doc. 15-3 at 25)  The ALJ concluded, however, that Claimant's impairment did not support limitations to the degree she alleged. (*Id.*)  As support for this conclusion, the ALJ cited to the record indicating that Claimant was treated only with NSAIDs and narcotics and that this treatment was effective in managing her symptoms, as evidenced by her statements to care providers in 2017 that the medications kept her active and functional throughout the day. (*Id.*)  The ALJ further noted that Claimant "did not receive any injections, nor did her provider recommend that she obtain a surgical consult." (*Id.*)  Addressing evidence that Claimant was prescribed a walker with four wheels and a seat, the ALJ concluded that the record does not indicate that a walker was medically necessary, as indicated by consistent remarks in the medical record that Claimant exhibited a full range of motion, full strength in her upper and lower extremities, and normal gait. (*Id.*)  The ALJ further noted the record did not suggest that Claimant ever presented at any of her medical appointments using an assistive device. (*Id.*)  Regarding Claimant's complaints of wrist pain, the ALJ accurately found there was no record of treatment for this condition and no evidence of the existence of such a condition from an acceptable medical source. (*Id.* at 23)  This assessment was consistent with 20 C.F.R. section 404.1529(a), which requires that an ALJ will consider all of a claimant's statements about their symptoms, but also that "statements about [a claimant's] pain or other symptoms will not alone establish that [a claimant] is disabled." 20 C.F.R. § 404.1529(a).  In addition, a claimant must establish there is "objective medical

evidence from an acceptable medical source that shows [a claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged[.]" *Id.*

Moreover, the ALJ specifically factored Claimant's impairments, to the extent he found support in the medical record, into his RFC determination that Claimant was limited to the full range of light work. (Doc. 15-3 at 23-27)

Claimant further argues the ALJ's analysis was flawed because he "compartmentalized" the opinions of Dr. Porter on Claimant's impairments, while Dr. Porter's opinion was based on the combined effect of Claimant's impairments. (Doc. 18 at 5-6) She contends that the "ALJ's compartmentalization of [Claimant's] impairments overlooks the compounding effect each impairment may have on the other." (*Id.* at 6) The record, however, indicates otherwise. The ALJ specifically stated that his review was of the "entire record" and that he considered "all symptoms" while making a determination of Claimant's RFC. (Doc. 15-3 at 23-24) The ALJ noted that Claimant had alleged disability "due to a combination of physical impairments." (*Id.* at 24) Moreover, the ALJ stated that the RFC he determined for Claimant was based on a combination of her impairments. (*Id.* at 27)

As noted, the Commissioner's decision to adopt an ALJ's findings must be supported by substantial evidence and free from reversible error. *Orn*, 495 F.3d at 630. Claimant accurately states the Ninth Circuit's position that "[i]f a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing *Lester*, 81 F.3d at 830-31). Claimant argues the ALJ "failed to articulate specific and legitimate reasons for rejecting Dr. Porter's opinion." (Doc. 18 at 10)

For the reasons set forth above, the Court concludes the ALJ's rejection of Dr. Porter's RFC Questionnaire opinions was supported by specific and legitimate reasons that were adequately supported by substantial evidence.

**B.    The ALJ provided clear and convincing reasons for rejecting Claimant's testimony about her pain, symptoms, and level of limitation**

Using boilerplate language, the ALJ stated that he found Claimant's "medically determinable impairments could reasonably be expected to cause [her] alleged symptoms[,]" but concluded that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Doc. 15-3 at 24)

If the ALJ finds that Claimant is not malingering, and Claimant "provided objective medical evidence of an underlying impairment which might reasonably produce the pain or other symptoms alleged, the ALJ may 'reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so.'" *Brown-Hunter v. Colvin*, 806 F.3d 487, 492-93 (9th Cir. 2015) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)).  "The clear and convincing standard is the most demanding required in Social Security cases." *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002).  This standard is not met by the ALJ "simply stat[ing] [his] non-credibility conclusion and then summariz[ing] the medical evidence." *Brown-Hunter*, 806 F.3d at 494.  Instead, an ALJ must identify which testimony he considers not credible, and "link that testimony to the particular parts of the record supporting her non-credibility determination." *Id.*  The ALJ's opinion "must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (internal quotations and citations omitted).

The ALJ identified Claimant's statements she was unable to work primarily due to symptoms of COPD and chronic pain in her shoulders, back, wrists, left knee, hips, and ankles, as well as anxiety, depression and memory problems.  (Doc. 15-3 at 24)  The ALJ first discussed Claimant's statements that:  (1) she was limited to lifting a gallon of milk, standing in place for no more than 5 to 15 minutes before needing to rest for 45 to 60

minutes, and sitting for just 5 to 10 minutes at a time; (2) suffered from edema and needed the assistance of a walker; (3) had difficulty bending over; and (4) experienced degradation of her mental condition after her consultative evaluation in 2015, resulting in panic attacks when she was away from home and difficulty being around other people. (*Id.*)  The ALJ then found this testimony was contradicted by Claimant's treating providers' consistent statements that Claimant exhibited normal range of motion in her neck and back, full strength in her upper and lower extremities, and normal gait. (*Id.* at 25) He further cited to evidence indicating:  (1) her treatment for back pain was conservative compared to her claims of impairment; (2) she reported that pain medications helped her sustain activities of daily living; (3) she had not received injections and had not been referred for surgery; (4) beginning in 2014, she obtained custody and cared for three of her grandchildren alone until December 2015; and (5) that Claimant suffered "no more than mild limitation in understanding, remembering, or applying information[,] interacting with others[,] concentrating, persisting, or maintaining pace[,] and adapting or managing oneself." (*Id.* at 25-26, referring to his citations to the record in his discussion of these four areas of mental functioning established in 20 C.F.R., Part 404, Subpart P, Appendix 1. (*Id.* at 22-23))

In consideration of the whole record, a reasonable person could have reached the same conclusion as the ALJ that Claimant suffers from the physical and mental impairments recognized by the ALJ, but is still capable of the full range of light work. Courts are required to defer to the ALJ's conclusion when the evidence is subject to more than one rational interpretation.  *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004).  "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  This is true even where "the agency explains its decision with less than ideal clarity," so long as "the agency's path may reasonably be discerned."  *Molina v. Astrue*, 674 F.3d 1104, 1121 (9th Cir. 2012) (internal quotation marks omitted) (citing *Alaska Dep't of Env't Conservation v. E.P.A.*,

540 U.S. 461, 497 (2004)). Put another way, the ALJ must "set forth the reasoning behind its decisions in a way that allows for meaningful review." *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015). The ALJ did so here. The Court finds the ALJ did not err and in fact provided clear and convincing reasons supported by substantial evidence for rejecting Claimant's testimony about her pain, symptoms, and level of limitation.

**VII.    CONCLUSION**

For the foregoing reasons, the Court finds the Commissioner's decision is supported by substantial evidence and is free from harmful legal error.

Accordingly,

**IT IS ORDERED** that the decision of the Commissioner of Social Security is **AFFIRMED**.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment and terminate this appeal.

Dated this 6th day of September, 2019.

_____
Honorable Deborah M. Fine
United States Magistrate Judge